**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on April 11, 2024**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| **v.** | : | **VIOLATIONS:** |
| **CHRISTINA CHAPMAN,** | : | **18 U.S.C. § 371 (Conspiracy to Defraud the United States)** |
| **JOHN DOE 1, alias JIHO HAN,** | : | **18 U.S.C. §§ 1343, 1349 (Conspiracy to Commit Wire Fraud)** |
| **JOHN DOE 2, alias HAORAN XU,** | : | **18 U.S.C. §§ 1344, 1349 (Conspiracy to Commit Bank Fraud)** |
| **JOHN DOE 3, alias CHUNJI JIN,** | : | **18 U.S.C. § 1028A(a)(1) (Aggravated Identity Theft)** |
| **Defendants.** | : | **18 U.S.C. §§ 1028(a)(7), (b)(1)(D), (c)(3)(A) & (f) (Conspiracy to Commit Fraud and Related Activity in Connection with Identification Documents)** |
| | : | **18 U.S.C. §§ 1956(a)(1)(B)(i) & (h) (Conspiracy to Launder Monetary Instruments)** |
| | : | **18 U.S.C. § 1960 (Prohibition of Unlicensed Money Transmitting Business)** |
| | : | **8 U.S.C. § 1324a (Unlawful Employment of Aliens)** |
| | : | **18 U.S.C. § 2 (Aiding and Abetting)** |

**INDICTMENT**

The Grand Jury charges that, at times material to this Indictment:

**COUNT ONE**
(Conspiracy to Defraud the United States)

**INTRODUCTION**

1. Since 2003, the Democratic People's Republic of Korea ("DPRK" or "North Korea") has been under sanction by the United Nations ("UN") due to its testing and expansion of its nuclear weapons program. Since 2016, the United States has had comprehensive sanctions against North Korea, cutting it off from the U.S. financial system and limiting the ability of U.S. persons and companies to do business with North Koreans. As a result, North Korea has sponsored various subterfuge schemes to earn money for the regime.

2. According to a May 2022 advisory by the Department of State, the Department of the Treasury, and the Federal Bureau of Investigation, North Korea has dispatched thousands of highly-skilled information technology ("IT") workers around the world, earning revenue that contributes to the North Korean weapons programs, in violation of U.S. and UN sanctions. These workers (i) misrepresent themselves as foreign (non-North Korean) or U.S.-based teleworkers, including by using virtual private networks ("VPNs"), virtual private servers ("VPSs"), third-country internet protocol ("IP") addresses, proxy accounts, and falsified or stolen identification documents; (ii) surreptitiously obtain IT development employment from companies spanning a range of sectors and industries around the world; (iii) develop applications and software for their employers; and (iv) in some instances, use privileged access gained through such employment for illicit purposes, including enabling malicious cyber intrusions by other DPRK actors into an employer's network. These IT workers are often subordinate to North Korea's Munitions Industry Department ("MID"). MID is involved in key aspects of North Korea's weapons program, including overseeing the development of North Korea's ballistic missiles, weapons production, and research and development programs.

3. From in or around early 2020 until the present, one group of overseas IT workers has been perpetrating such a coordinated scheme to conduct remote work for U.S. companies, resulting in the transmission of false information to the United States and its agencies. Specifically, this group of overseas IT workers has stolen the identities of U.S. nationals; applied for remote jobs in the United States through the transmission of false documentation to the Department of Homeland Security ("DHS"); obtained jobs at hundreds of U.S. companies, to include Fortune 500 companies, often indirectly through staffing companies or other contracting organizations ("staffing companies"); received laptop computers and other hardware from U.S. companies through which they have access to the internal systems of the U.S. companies (generally, "laptops"); and been paid millions of dollars for their work, much of which has been falsely reported to the Internal Revenue Service ("IRS") and the Social Security Administration ("SSA") in the name of the actual U.S. persons whose identities have been false, stolen, or borrowed. The overseas IT workers have been assisted in this scheme by various U.S. nationals, who have acted knowing that the overseas IT workers were, in fact, not located in the United States, that they used false, stolen, or borrowed identities belonging to real U.S. persons, and that they were defrauding the U.S. companies.

4. From in or around October 2020, until on or about October 26, 2023, Christina Marie CHAPMAN, a U.S. national, conspired with certain overseas IT workers to affect a scheme to defraud the United States and its agencies. Specifically, CHAPMAN: (i) assisted the overseas IT workers in validating stolen identity information of U.S. citizens so the overseas IT workers could pose as U.S. citizens; (ii) received and hosted laptops issued by U.S. companies to the overseas IT workers in her U.S. residences (a "laptop farm"), so that the companies believed the workers to be located in the United States, and sent other laptops from her residences to overseas

IT workers abroad; (iii) at her laptop farms, logged into the U.S. companies' laptops and assisted the overseas IT workers with connecting remotely, so it appeared that the logins were coming from the United States; and (iv) received paychecks for the overseas IT workers at her home, forged the signatures of the beneficiary on the checks, and deposited them to her U.S. financial institution, thereafter further transferring the proceeds of the scheme to the overseas IT workers. In exchange, CHAPMAN charged monthly fees to the overseas IT workers for her services, enriching herself off the scheme.

5. The conspiracy perpetrated a staggering fraud on a multitude of industries, at the expense of generally unknowing U.S. companies and persons. It impacted more than 300 U.S. companies, compromised more than 60 identities of U.S. persons, caused false information to be conveyed to DHS on more than 100 occasions, created false tax liabilities for more than 35 U.S. persons, and resulted in at least $6.8 million of revenue to be generated for the overseas IT workers. The overseas IT workers worked at blue-chip U.S. companies, including a top-5 national television network and media company, a premier Silicon Valley technology company, an aerospace and defense manufacturer, an iconic American car manufacturer, a high-end retail chain, and one of the most recognizable media and entertainment companies in the world, all of which were Fortune 500 companies. The overseas IT workers also exfiltrated data from at least two U.S. companies— a multinational restaurant chain and a classic American clothing brand. The overseas IT workers also attempted to gain employment and access to information at two different U.S. government agencies on three different occasions, although these attempts were discovered and thwarted, due to the agencies' enhanced due diligence.

## BACKGROUND

### *A. Sanctions Against North Korea*

6. In December 1985, North Korea ratified the Nuclear Non-Proliferation Treaty ("NPT"). On January 10, 2003, North Korea withdrew from the NPT. On October 14, 2006, the UN Security Council passed Resolution 1718 condemning North Korea's first nuclear test and imposed sanctions on North Korea, including the supply of heavy weapons and select luxury goods. After successive nuclear tests by North Korea, the UN Security Council strengthened or imposed additional sanctions in 2009, 2013, 2016, and 2017.

7. The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50 U.S.C. § 1701 *et seq.*, enacted in 1977, authorizes the President to impose economic sanctions in response to an unusual or extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat. Pursuant to that authority, on March 15, 2016, the President issued EO 13722 addressing the Government of North Korea's continuing pursuit of its nuclear and missile programs. EO 13722 imposed a comprehensive blocking of the Government of North Korea and the Workers' Party of Korea. Pursuant to that authority, on March 16, 2016, the Secretary of the Treasury promulgated the "North Korea Sanctions Regulations." *See* 31 C.F.R. § 510.101 *et seq*. (amended 83 Fed. Reg. 9182 (Mar. 5, 2018)). These authorities generally prohibited the exportation and re-exportation of goods, services (including financial services), and technology to North Korea, unless exempt or authorized by the Department of the Treasury. Under these orders, U.S. financial institutions were barred from providing banking services to North Korea entities. These authorities barred any

transaction by any U.S. person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in these Executive Orders or regulations.

8. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures to ensure that U.S. bank accounts are not used to finance terrorism or to avoid sanctions programs administered by the Department of the Treasury. The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system. FinCEN is located in Washington, D.C. The Bank Secrecy Act gives FinCEN a range of options, called special measures, which can be adapted to target specific money laundering and terrorist financing concerns. *See* USA PATRIOT Act § 311, codified at 31 U.S.C. § 5318A. Under this authority, in June 2016, FinCEN determined that the entire North Korean financial sector was a "primary money laundering concern." Federal Register, Vol. 81, No. 107 (June 3, 2016). On November 9, 2016, FinCEN implemented a special measure, effectively barring all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions in the United States. Failure to comply with the special measure resulted in civil and criminal penalties for U.S. financial institutions. As a result of the North Korea sanctions, the FinCEN 311 action, and overall risk management, beginning in at least March 2016, U.S. banks refused to knowingly process any U.S. dollar wire transactions involving entities in North Korea.

***B. U.S. Work Authorization and the Relevant Federal Agencies***

9. DHS U.S. Citizenship and Immigration Services ("USCIS") is the federal agency responsible for ensuring employment eligibility for workers in the United States. DHS and USCIS are located in the District of Columbia.

a. Federal law requires that every U.S. employer who recruits, refers for a fee, or hires an individual for employment in the United States must complete Form I-9, Employment Eligibility Verification ("Form I-9"). A Form I-9 must be completed for every individual hired for employment in the United States, including citizens and noncitizens. On the form, an employee must attest to their employment authorization. The employee must also present their employer with acceptable documents as evidence of identity and employment authorization. The employer must examine these documents to determine whether they reasonably appear to be genuine and relate to the employee, then record the document information on the employee's Form I-9. Employers must have a completed Form I-9, on file for each person on their payroll (or otherwise receiving remuneration) who is required to complete the form.

b. As a voluntary alternative to the Form I-9 process, employers may use E-Verify, a web-based system run by USCIS. In the E-Verify process, employers create cases based on information taken from an employee's Form I-9. E-Verify then electronically compares that information to records available to DHS and SSA. E-Verify generates a response to the employer confirming the employee's employment eligibility or indicating that the employee needs to take further action to complete the case. Although E-Verify requires the use of a photographic identity document, it does not have the ability to query submitted state drivers' license photographs against the state drivers' license databases.

c. Prior to August 2023, U.S. employers were generally required to review employment eligibility documents in person. After August 2023, employers could

remotely examine and submit employment eligibility documentation through E-Verify.

10. IRS is the federal agency responsible for collection of taxes from U.S. employers and employees. IRS is located in the District of Columbia. Generally, U.S. employers withhold federal taxes from the pay checks of their employees and transmit those funds to the United States government. Generally, U.S. employers transmit to IRS reports of the total wages earned and the total taxes withheld for each calendar year. Generally, U.S. employees are responsible for determining their tax liability based on the amount of wages earned in the tax year and the amount of taxes withheld.

11. SSA is the federal agency responsible for administering retirement, disability, survivor, and family benefits, and enrolling eligible individuals in Medicare. SSA also provides Social Security Numbers, which are unique identifiers needed to work, and a database of which is used to verify employment eligibility by the E-Verify system. Generally, U.S. employers withhold federal social security taxes from the pay checks of their employees and transmit those funds to the United States government. Generally, U.S. employers transmit reports to the SSA of the total wages earned and the total social security taxes withheld for each calendar year. Generally, U.S. employees are eligible for benefits from SSA on the basis of this reported information.

**THE CONSPIRATORS**

12. Defendant Christina CHAPMAN is a U.S. national, who resided in Minnesota and Arizona.

13. JOHN DOE 1, alias 한지호 Jiho HAN (HAN), was an individual residing overseas who opened accounts with a foreign money service transmitter ("MST") that conducts U.S. dollar transactions through a branch in New York (hereinafter "MST-1"). These accounts were used to

receive payroll funds from U.S. companies associated with laptops that were being hosted at CHAPMAN's residences. HAN would then forward the funds to an individual in the People's Republic of China ("China"). HAN also received funds from CHAPMAN for an overseas IT worker that CHAPMAN first deposited into one of her U.S. financial accounts.

14. JOHN DOE 2, alias 浩然 徐 Haoran XU (XU), was an individual residing overseas who registered for financial accounts with U.S. MSTs. XU provided his name, date of birth, and a Chinese National ID to U.S. MSTs to register for these accounts. XU received money generated through the conspiracy into these accounts, including from CHAPMAN. XU's name and address were also used by CHAPMAN and other coconspirators to receive packages in China, including packages containing laptops for remote work at U.S. companies. XU used two U.S.-based MST accounts, both of which listed his address as Dandong, China, a city on the border with North Korea.

15. JOHN DOE 3, alias 春姬 金 Chunji JIN (JIN), was an individual residing overseas who registered for financial accounts with U.S. MSTs. JIN provided her name, date of birth, and a Chinese National ID to U.S. MSTs to register for these accounts. JIN received money generated through the conspiracy into these accounts, including from CHAPMAN. JIN's name and address were also used by CHAPMAN and other coconspirators to receive packages in China, including packages containing laptops for remote work at U.S. companies. JIN used two U.S.-based MSTs, one of which listed her address as Dandong, China, a city on the border with North Korea.

16. JOHN DOE 4, alias or moniker "Zhonghua," and "Venechor S." (hereinafter "Zhonghua") was a foreign national not authorized to work in the United States. Zhonghua was a manager of other overseas IT workers and had direct communication with CHAPMAN regarding the scheme.

17. At all times relevant to this Indictment, CHAPMAN, HAN, XU, JIN, and Zhonghua knew that the individuals with whom they conspired to obtain remote IT work were foreign nationals not located in the United States, and not authorized to work in the United States.

**JURISDICTION AND VENUE**

18. Acts and omissions in furtherance of the offenses alleged herein occurred within the District of Columbia. Pursuant to Title 18, United States Code, Section 3237, venue is proper in the District of Columbia.

19. Additionally, certain of the offenses alleged herein were begun and committed outside of the jurisdiction of any particular state or district of the United States. For those offenses, pursuant to Title 18, United States Code, Section 3238, venue is proper in the District of Columbia.

**THE CONSPIRACY**

20. Beginning at least in or around October 2020, the exact date being unknown to the Grand Jury, through on or about October 26, 2023, CHAPMAN and others known and unknown to the Grand Jury, in the District of Columbia and elsewhere, knowingly combined, conspired, and agreed together and with each other to defraud by means of deceit, craft, trickery, and dishonesty the United States and its agencies, to include:

a. DHS, by submitting false identification information stolen or borrowed from U.S. persons to DHS for employment eligibility verification through the use of the E-Verify system;

b. IRS, by causing U.S. employers to submit false information regarding wages earned by U.S. persons, when in fact those persons did not work for said employers and had their identities stolen or borrowed, and thereafter creating false tax liabilities in the name of the U.S. persons; and

c. SSA, by causing U.S. employers to submit false information regarding benefits earned by U.S. persons, when in fact those persons did not work for said employers and had their identities stolen or borrowed, and thereafter creating false benefit coverage in the name of the U.S. persons.

21. The goals and purposes of the Conspiracy were, among others, to obtain U.S. employment for the overseas IT workers through the use of false, borrowed, or stolen identities in violation of U.S. laws, to generate revenue for the overseas IT workers and their associates, and to generate revenue for CHAPMAN.

***Manner and Means***

22. It was further a part of the Conspiracy that the coconspirators used the following manner and means, among others, to achieve the goals of the Conspiracy:

a. The overseas IT workers stole the identities of U.S. persons, and otherwise convinced U.S. persons to loan the overseas IT workers their identities for money;

b. The overseas IT workers validated the stolen U.S. person identities by using online background check service providers, under accounts opened, authorized, and paid for by CHAPMAN;

c. The overseas IT workers identified jobs of interest in U.S. companies, including Fortune 500 companies, in fields such as technology, car manufacturing, aerospace, media, retail, and food delivery;

d. The overseas IT workers developed fictitious personas and online profiles to match the job requirements for remote IT worker positions at the U.S. companies and government agencies;

e. The overseas IT workers applied for jobs at the U.S. companies and government agencies, and transmitted false information to DHS as part of an employment eligibility check, to include stolen or borrowed identity information, false drivers' licenses, false Social Security cards, and passports and permanent resident identification cards for individuals other than themselves;

f. CHAPMAN assisted overseas IT workers with transmitting false information and false documents to their employers for the purposes of employment eligibility verification;

g. The overseas IT workers directed the U.S. companies to send their company-issued laptops to CHAPMAN's U.S.-based addresses;

h. CHAPMAN hosted these laptops at her residences, logging into the U.S. companies' networks, sometimes daily, and then permitting the coconspirator overseas IT workers to connect remotely to the laptops;

i. CHAPMAN sent certain of these laptops to the overseas IT workers at locations in China and elsewhere;

j. The overseas IT workers caused the U.S. companies to issue paychecks in the names of stolen, false, and borrowed U.S. person identities, and on numerous occasions, directed those payments to be sent to CHAPMAN's residences;

k. CHAPMAN forged the signature of the false, stolen, or borrowed U.S. person identities on checks sent to her residence and deposited those checks at her bank, U.S. Financial Institution 1 ("USFI-1"); and

l. CHAPMAN, HAN, XU, JIN, and Zhonghua transferred money between and among accounts at U.S. financial institutions and MSTs, which were further

transferred to other conspirators.

*Overt Acts*

23. In furtherance of this Conspiracy and to accomplish its goals, the following overt acts, among others, were committed in the District of Columbia and elsewhere:

- ***Initiation of the Conspiracy***

a. In or around March 2020, an unknown coconspirator approached CHAPMAN, through her LinkedIn page, and asked her to "be the U.S. face" of their company and assist them in helping the overseas IT workers gain remote employment in the United States.

- ***Targeting of U.S. Companies***

b. Between in or around August 2022, through in or around November 2023, a group of North Korean IT workers stored a set of files related to the scheme in an online repository. These files included documents about attempting to obtain employment in the United States as remote workers, including guides and tips related to topics about writing a cover letter, building a resume, sample resumes, scripts for interviews, and a scanned copy of a stolen U.S. Permanent Resident Card. Included in the documents were 59 job postings, including:

i. A job post for a "Video Streaming Engineer" Company 1, a top-5 national television network and media company, headquartered in New York. As discussed further herein, infra ¶ 23(w), on or about November 21, 2022, a remote IT worker associated with CHAPMAN obtained employment as a video engineer for Company 1's streaming service;

ii. A job post for a "Python Developer" at Staffing Company 1, a

professional staffing company, which staffs contractors at thousands of U.S. companies, headquartered in Florida. As discussed further herein, infra ¶ 23(aa), on or about June 16, 2023, a remote IT worker associated with CHAPMAN, claiming experience in using "Python" software, obtained employment at Staffing Company 1; and

iii. A job post for a "Video Streaming Engineer" at Staffing Company 2, a professional staffing company. As discussed further herein, infra ¶ 23(dd) below, on or about May 17, 2022, a remote IT worker associated with CHAPMAN, obtained employment at Staffing Company 2 for this contract, and was contracted to the Company 3, a Fortune 500 company and one of the most recognizable media and entertainment companies in the world, headquartered in California.

c. Between on or about September 21, 2022, and on or about March 3, 2023, a contractor using the name "Asolelei T." obtained employment at Cyber Security Firm-1 ("CSF-1"), a cyber-security contractor located in California, through a staffing company. "Asolelei T." was a U.S. person identity that was used for remote IT positions that were associated with Chapman's laptop farm. During the time period of his employment, "Asolelei T." used a number of tactics, techniques, and procedures associated with the group of North Korean IT workers identified above, to include remote control web browser extensions to provide remote access to CSF-1's system via proxy services and VPNs to mask his IP address. In addition to "Asolelei T.," eight other contractors associated with this group of North Korean IT workers obtained jobs at CSF-1, all hired

through third-party staffing companies. In total, three of these individuals used U.S. person identities that were also used at CHAPMAN's laptop farm. As described further herein, CHAPMAN invoiced the coconspirator overseas IT workers for services related to two CSF-1 laptops hosted at her laptop farm.

- ***Targeting of U.S. Person Identities***

d. On or about February 25, 2022, a coconspirator registered an account associated with CHAPMAN's name and address with a Maryland-based online background check service provider, Online Background Check Service-1 ("OBCS-1").

e. On or about February 25, 2022, CHAPMAN messaged a coconspirator overseas IT worker identified as "Joren Jo" ("JJ"). CHAPMAN provided JJ with her debit card information, which was used to make payments on an account in CHAPMAN's name with OBCS-1. CHAPMAN told JJ that she would "add the total charge to the invoice."

f. On or about February 25, 2022, a coconspirator created an account at MST-2 (hereinafter "MST-2 Account A"), headquartered in California, using CHAPMAN's identifying information, CHAPMAN's debit card, and an email address for a coconspirator overseas IT worker. Thereafter, MST-2 Account A was used for payments to the OBCS-1 account associated with CHAPMAN.

g. On or about January 20, 2023, CHAPMAN provided information for another of her debit cards to an overseas IT worker, via a messaging application.

h. On or about February 15, 2023, a coconspirator created another MST-2 account (hereinafter "MST-2 Account B") with CHAPMAN's identifying information,

the new debit card, and the email address of a coconspirator overseas IT worker.

i. Between on or about February 25, 2022, and on or about August 2, 2023, coconspirator overseas IT workers used the OBCS-1 account associated with CHAPMAN to conduct more than 80 queries, to include criminal history reports and Social Security Number traces, of the following 57 U.S. persons' identities, verifying their information and Social Security Numbers, in order to further their impersonation of these U.S. persons with U.S. employers:

| **Sub-¶** | **U.S. Identity** |
|---|---|
| 1 | "Aaron L." |
| 2 | "Aaron M." |
| 3 | "Adrian S." |
| 4 | "Andrew C." |
| 5 | "Andrew S." |
| 6 | "Arion S." |
| 7 | "Arkim P." |
| 8 | "Arnaldo M." |
| 9 | "Breeyan C." |
| 10 | "Brett S." |
| 11 | "Brian S." |
| 12 | "Byron P." |
| 13 | "Carol W." |
| 14 | "Carol W." |
| 15 | "Christopher A." |
| 16 | "Christopher H." |
| 17 | "Chuck C." |
| 18 | "Cole D." |
| 19 | "Daniel M." |
| 20 | "Darnell M." |
| 21 | "Daron T." |
| 22 | "Dong C." |
| 23 | "Dustin S." |
| 24 | "Dustin S." |
| 25 | "Gregory J." |

| | |
|---|---|
| 26 | "Guillermo C." |
| 27 | "Jacob L." |
| 28 | "Jamal M." |
| 29 | "James V." |
| 30 | "Jamie M." |
| 31 | "Jared G." |
| 32 | "Joe C." |
| 33 | "JungWoo L." |
| 34 | "Justin G." |
| 35 | "Justin G." |
| 36 | "Kalvim W." |
| 37 | "Kelly K." |
| 38 | "Kevin S." |
| 39 | "Lamar M." |
| 40 | "Michael B." |
| 41 | "Michael P." |
| 42 | "Pheng C." |
| 43 | "Pu H." |
| 44 | "Richard C." |
| 45 | "Ronald Z." |
| 46 | "Ruben G." |
| 47 | "Scott O." |
| 48 | "Shunquez L." |
| 49 | "Steven A." |
| 50 | "Steven L." |
| 51 | "Thomas K." |
| 52 | "Thomas K." |
| 53 | "Tony C." |
| 54 | "Victor C." |
| 55 | "Victor K." |
| 56 | "Weichong C." |
| 57 | "Yu D." |

j. Between on or about February 25, 2022, and on or about August 2, 2023, CHAPMAN and her coconspirators paid the fees associated with OBCS-1 accounts in CHAPMAN's name via the following methods:

| Sub-¶ | Number of Transactions | Total Amount | CHAPMAN Account |
|---|---|---|---|
| 1 | 42 | $ 501.20 | MST-2 Account A |
| 2 | 11 | $ 115.85 | MST-2 Account B |
| 3 | 27 | $ 189.00 | USFI-2 Account |

k. On or about December 14, 2021, an overseas IT worker registered an account with a California-based online background check service provider, OBCS-2.

l. Between on or about December 14, 2021, and on or about November 14, 2023, coconspirator overseas IT workers used OBCS-2's website to query more than 1,700 U.S. persons' identities, in order to verify their information, including the following 56 stolen U.S. persons' identities which were used in the scheme:

| Sub-¶ | U.S. Identity |
|---|---|
| 1 | "Dong C." |
| 2 | "Asolelei T." |
| 3 | "Darius P." |
| 4 | "Kevin S." |
| 5 | "Cody W." |
| 6 | "Daniel B." |
| 7 | "Brian S." |
| 8 | "WeiChong C." |
| 9 | "Marcus M." |
| 10 | "Jade H." |
| 11 | "Sion W." |
| 12 | "Kou T." |
| 13 | "Ryan F." |
| 14 | "James B." |
| 15 | "Scott L." |
| 16 | "Willy E." |

| | |
|---|---|
| 17 | "Curtis W." |
| 18 | "Royd L." |
| 19 | "Steven L." |
| 20 | "Nathanael D." |
| 21 | "Joseph P." |
| 22 | "Michael G." |
| 23 | "Breeyan C." |
| 24 | "Daniel P." |
| 25 | "Kentrell M." |
| 26 | "Alexander M." |
| 27 | "Jami J." |
| 28 | "Justin S." |
| 29 | "Matthew L." |
| 30 | "Sutton A." |
| 31 | "Troy S." |
| 32 | "Nathan H." |
| 33 | "Randy B." |
| 34 | "Raymond S." |
| 35 | "Phong T." |
| 36 | "Joshua T." |
| 37 | "Jerry P." |
| 38 | "Michael H." |
| 39 | "Charles W." |
| 40 | "Michael P." |
| 41 | "Michael P." |
| 42 | "Pheng C." |
| 43 | "Pu H." |
| 44 | "Richard C." |
| 45 | "Ronald Z." |
| 46 | "Ruben G." |
| 47 | "Scott O." |
| 48 | "Shunquez L." |
| 49 | "Steven A." |
| 50 | "Steven L." |
| 51 | "Thomas K." |
| 52 | "Tony C." |
| 53 | "Victor C." |
| 54 | "Victor K." |

| 55 | "Weichong C." |
|---|---|
| 56 | "Yu D." |

m. Between on or about December 15, 2021, and on or about October 16, 2023, coconspirator overseas actors made payments to OBCS-2 for associated searches using a third MST-2 account controlled by CHAPMAN (hereinafter "MST-2 Account C").

n. On or about September 21, 2023, CHAPMAN messaged with a coconspirator overseas IT worker using the screenname "Chai D.," wherein Chai D. asked CHAPMAN to retrieve a physical badge at Company 5, a Fortune 500 aerospace and defense manufacturer. CHAPMAN said she would send one of her assistants, but noted that "they don't know that you guys use 'borrowed identities'." CHAPMAN asked Chai D. whether he was indeed "Ryan F.," the worker employed at Company 5 who had received a physical badge. Chai D. answered, "no" and CHAPMAN replied, "So it's a stolen identity…And you're asking me to have my assistant handle something that is illegal."

o. On or about October 12, 2023, Chai D. sent CHAPMAN a message related to a payment for CHAPMAN's assistant picking up the Company 5 physical ID. CHAPMAN responded, "That's actually Zhonghua's account. He'll have to send it to me from there."

p. On or about October 12, 2023, CHAPMAN received a payment for $200 from MST-1 from an account with the name of "Venechor S.," an account associated with Zhonghua.

q. On or about November 15, 2022, CHAPMAN messaged with an overseas IT worker using the screenname "Alexander The Great" ("AT"), wherein AT asked

CHAPMAN for assistance creating a background story for a stolen U.S. person identity, "Daniel B." AT noted that the real Daniel B. had a criminal record and employers were asking for more information as to what offenses were committed. CHAPMAN provided a cover story and asked "What information do you know about Daniel B[.]?? Do you know his race?" AT responded that the real Daniel B. was "a black man" but that he (AT) was Asian. AT then gave CHAPMAN his "real full name," which was a Chinese name.

- ***Transmitting False Information to Gain Employment, Including to DHS***

r. On or about the following dates, coconspirator overseas IT workers applied for employment with U.S. companies and caused U.S. companies to transmit false information, to include false information about U.S. persons' identities and false documents to DHS USCIS via the E-Verify system, in order to verify employment eligibility:

| Sub-¶ | Case Initiated Date | U.S. Person Identity | Document 1 | State | Document 2 |
|---|---|---|---|---|---|
| 1 | 7/1/2021 | "Asolelei T." | State Driver's License/ID | CA | Social Security ("SS") Card |
| 2 | 11/4/2021 | "Asolelei T." | State Driver's License/ID | CA | SS Card |
| 3 | 12/15/2021 | "Asolelei T." | State Driver's License/ID | CA | SS Card |
| 4 | 4/28/2022 | "Asolelei T." | State Driver's License/ID | CA | SS Card |
| 5 | 9/21/2022 | "Asolelei T." | State Driver's License/ID | CA | SS Card |
| 6 | 11/3/2022 | "Asolelei T." | State Driver's License/ID | CA | SS Card |
| 7 | 11/1/2022 | "Breeyan C." | State Driver's License/ID | CA | SS Card |
| 8 | 12/5/2022 | "Breeyan C." | State Driver's License/ID | CA | SS Card |
| 9 | 7/20/2023 | "Breeyan C." | State Driver's License/ID | CA | SS Card |
| 10 | 6/14/2023 | "Brian S." | State Driver's License/ID | AL | SS Card |
| 11 | 3/10/2023 | "Chai D." | State Driver's License/ID | TX | SS Card |
| 12 | 4/18/2022 | "Charles C." | State Driver's License/ID | CA | SS Card |
| 13 | 4/26/2022 | "Charles C." | State Driver's License/ID | CA | SS Card |

| | | | | | |
|---|---|---|---|---|---|
| 14 | 6/24/2022 | "Charles/Mailee C." | State Driver's License/ID | CA | SS Card |
| 15 | 9/25/2023 | "Cody W." | State Driver's License/ID | AL | SS Card |
| 16 | 9/26/2023 | "Cody W." | State Driver's License/ID | AL | SS Card |
| 17 | 10/13/2023 | "Cody W." | State Driver's License/ID | AL | SS Card |
| 18 | 10/12/2022 | "Daniel B." | State Driver's License/ID | NY | SS Card |
| 19 | 10/17/2022 | "Daniel B." | State Driver's License/ID | NY | SS Card |
| 20 | 11/15/2022 | "Daniel B." | State Driver's License/ID | NY | SS Card |
| 21 | 5/12/2023 | "Darius W." | State Driver's License/ID | SC | SS Card |
| 22 | 5/15/2023 | "Darius W." | State Driver's License/ID | SC | SS Card |
| 23 | 9/27/2023 | "Darius W." | State Driver's License/ID | SC | SS Card |
| 24 | 10/11/2023 | "Darius W." | State Driver's License/ID | SC | SS Card |
| 25 | 10/19/2023 | "Darius W." | State Driver's License/ID | SC | SS Card |
| 26 | 5/10/2021 | "David S." | ID card from U.S. gov. agency | n/a | U.S. birth certificate |
| 27 | 7/6/2021 | "David S." | State Driver's License/ID | GA | Cons Rep of Birth Abroad (FS-240) |
| 28 | 8/19/2021 | "David S." | State Driver's License/ID | GA | Cert of Rep of Birth (DS-1350) |
| 29 | 11/29/2021 | "David S." | ID card from U.S. gov. agency | n/a | Cert of Rep of Birth (DS-1350) |
| 30 | 1/11/2022 | "David S." | State Driver's License/ID | GA | U.S. birth certificate |
| 31 | 1/14/2022 | "David S." | State Driver's License/ID | GA | U.S. birth certificate |
| 32 | 4/11/2022 | "David S." | State Driver's License/ID | GA | U.S. birth certificate |
| 33 | 4/28/2022 | "David S." | State Driver's License/ID | GA | U.S. birth certificate |
| 34 | 6/10/2022 | "David S." | State Driver's License/ID | GA | U.S. birth certificate |
| 35 | 6/13/2022 | "David S." | State Driver's License/ID | GA | U.S. birth certificate |
| 36 | 7/3/2023 | "Dong C." | State Driver's License/ID | TX | SS Card |
| 37 | 9/18/2023 | "Dong C." | State Driver's License/ID | TX | SS Card |
| 38 | 10/3/2023 | "Dong C." | State Driver's License/ID | TX | SS Card |
| 39 | 11/22/2023 | "Dong C." | State Driver's License/ID | TX | SS Card |
| 40 | 3/23/2022 | "Frank A." | State Driver's License/ID | TX | SS Card |

| | | | | | |
|---|---|---|---|---|---|
| 41 | 4/8/2022 | "Frank A." | State Driver's License/ID | TX | SS Card |
| 42 | 6/3/2022 | "Frank A." | State Driver's License/ID | TX | SS Card |
| 43 | 7/13/2022 | "Frank A." | State Driver's License/ID | TX | SS Card |
| 44 | 7/19/2022 | "Frank A." | State Driver's License/ID | TX | SS Card |
| 45 | 7/28/2023 | "Frank A." | State Driver's License/ID | TX | SS Card |
| 46 | 2/21/2022 | "Frank C." | State Driver's License/ID | TX | SS Card |
| 47 | 4/27/2022 | "Frank C." | State Driver's License/ID | TX | SS Card |
| 48 | 3/2/2021 | "Guillermo C." | Alien Resident Card | n/a | n/a |
| 49 | 6/7/2021 | "Guillermo C." | Alien Resident Card | n/a | n/a |
| 50 | 8/26/2021 | "Guillermo C." | Alien Resident Card | n/a | n/a |
| 51 | 5/3/2022 | "Guillermo C." | State Driver's License/ID | NV | SS Card |
| 52 | 5/4/2022 | "Guillermo C." | State Driver's License/ID | NV | SS Card |
| 53 | 5/9/2022 | "Guillermo C." | Alien Resident Card | n/a | n/a |
| 54 | 5/11/2022 | "Guillermo C." | State Driver's License/ID | NV | SS Card |
| 55 | 5/11/2022 | "Guillermo C." | State Driver's License/ID | NV | SS Card |
| 56 | 5/20/2022 | "Guillermo C." | State Driver's License/ID | NV | SS Card |
| 57 | 5/23/2022 | "Guillermo C." | State Driver's License/ID | NV | SS Card |
| 58 | 10/5/2022 | "Guillermo C." | State Driver's License/ID | NV | SS Card |
| 59 | 10/20/2022 | "Guillermo C." | State Driver's License/ID | NV | SS Card |
| 60 | 3/23/2023 | "Jack W." | U.S. Passport/Passport Card | n/a | n/a |
| 61 | 12/28/2021 | "Jacob L." | State Driver's License/ID | CA | SS Card |
| 62 | 7/7/2022 | "Jacob L." | State Driver's License/ID | CA | SS Card |
| 63 | 9/7/2023 | "Jade H." | State Driver's License/ID | MI | SS Card |
| 64 | 10/18/2023 | "Jade H." | State Driver's License/ID | MI | SS Card |
| 65 | 5/18/2023 | "James B." | State Driver's License/ID | PA | SS Card |
| 66 | 7/11/2023 | "James B." | State Driver's License/ID | PA | SS Card |
| 67 | 8/22/2023 | "James B." | State Driver's License/ID | PA | SS Card |
| 68 | 2/8/2022 | "Jungwoo L." | State Driver's License/ID | AR | SS Card |
| 69 | 2/8/2022 | "Jungwoo L." | State Driver's License/ID | AR | SS Card |
| 70 | 2/8/2022 | "Jungwoo L." | State Driver's License/ID | AR | SS Card |
| 71 | 2/8/2022 | "Jungwoo L." | State Driver's License/ID | AR | SS Card |
| 72 | 2/8/2022 | "Jungwoo L." | State Driver's License/ID | AR | SS Card |
| 73 | 2/8/2022 | "Jungwoo L." | State Driver's License/ID | AR | SS Card |
| 74 | 2/9/2022 | "Jungwoo L." | Alien Resident Card | n/a | n/a |
| 75 | 12/30/2022 | "Kevin S." | State Driver's License/ID | SC | SS Card |
| 76 | 1/23/2023 | "Kevin S." | State Driver's License/ID | SC | SS Card |
| 77 | 3/17/2023 | "Kevin S." | State Driver's License/ID | SC | SS Card |

| | | | | | |
|---|---|---|---|---|---|
| 78 | 6/26/2023 | "Kevin S." | State Driver's License/ID | SC | SS Card |
| 79 | 9/27/2021 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 80 | 12/3/2021 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 81 | 2/17/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 82 | 4/28/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 83 | 5/6/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 84 | 6/28/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 85 | 7/26/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 86 | 8/11/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 87 | 8/23/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 88 | 8/29/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 89 | 9/1/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 90 | 10/18/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 91 | 10/24/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 92 | 11/1/2022 | "Lee Y." | State Driver's License/ID | CA | SS Card |
| 93 | 9/19/2022 | "Marcus M." | State Driver's License/ID | MN | SS Card |
| 94 | 9/27/2022 | "Marcus M." | State Driver's License/ID | MN | SS Card |
| 95 | 3/14/2023 | "Marcus M." | U.S. Passport/Passport Card | n/a | n/a |
| 96 | 11/1/2023 | "Marcus M." | State Driver's License/ID | MN | SS Card |
| 97 | 3/21/2023 | "Matthew R." | State Driver's License/ID | FL | SS Card |
| 98 | 4/4/2023 | "Matthew R." | State Driver's License/ID | FL | SS Card |
| 99 | 11/14/2022 | "Michael G." | State Driver's License/ID | PA | SS Card |
| 100 | 6/28/2023 | "Nathanael D." | State Driver's License/ID | NY | SS Card |
| 101 | 6/5/2023 | "Ryan F." | State Driver's License/ID | MD | SS Card |
| 102 | 8/2/2023 | "Ryan F." | State Driver's License/ID | MD | SS Card |
| 103 | 8/2/2023 | "Ryan F." | State Driver's License/ID | MD | SS Card |
| 104 | 9/14/2023 | "Ryan F." | State Driver's License/ID | MD | SS Card |
| 105 | 4/13/2022 | "Salem O." | U.S. Passport/Passport Card | n/a | n/a |
| 106 | 7/25/2023 | "Sion W." | State Driver's License/ID | CA | SS Card |
| 107 | 1/30/2023 | "Steven L." | State Driver's License/ID | AL | SS Card |

s. Between on or about April 22, 2022, and on or about April 26, 2022, CHAPMAN messaged with a coconspirator overseas IT worker using the screenname "Max," wherein they discussed CHAPMAN assisting in submitting

a Form I-9 to a U.S. company for the U.S. person identity "Weichong C.":

> Max: So we need to send envolop [sic] to any USPS location to receive the equipment. I want you to print the following forms and sign with my name and sent it to them. Please help me, Christina.
> [MEDIA ITEM: Label-Weichong C.pdf]
> [MEDIA ITEM: I-9 Electronic Blank.pdf] . . . .
>
> CHAPMAN: Your I-9 didn't come through properly. I can't print it out. . . .
>
> CHAPMAN: I finally got it printed. I will copy the information tomorrow and get it sent out.
>
> Max: Got it[] Got it. . . . Please ship out the hand signed I-9 form by the end of the day" The company send message again. Could you please help me today?
>
> CHAPMAN: Yes. I'll get it out today. . . . I did my best to copy your signature.
>
> Max: haha. Thank you.
>
> CHAPMAN: Your paperwork got sent out today.

t. On or about August 2, 2023, CHAPMAN had a group messaging conversation that included several coconspirator overseas IT workers, in which CHAPMAN acknowledged the severity of falsifying employment eligibility forms (i.e., the Form I-9). Specifically, CHAPMAN stated, "In the future, I hope you guys can find other people to do your physical I9s. These are federal documents. I will SEND them for you, but have someone else do the paperwork. I can go to FEDERAL PRISON for falsifying federal documents."

u. Between on or about August 28, 2023, and on or about August 29, 2023, CHAPMAN messaged with a coconspirator overseas IT worker using the screenname "Chong," wherein they discussed CHAPMAN's assistance in transmitting false identity documents to a U.S. employer for employment

eligibility verification:

> Chong: I received an offer from [Company 55] . . . . [C]ould you please print two documents on paper and deliver to NY? . . . It's not a card, it's a paper. The temporary DL card. Can you help me with that? . . . Because I can't make a valid DL card, I said that I had lost my DL card. The company provided another option – I can do the drug test with the temporary DL card in my hand. So I have to find another person who can do the drug test with the document once you print them. I checked by online research for [sic] several times and it's said that the temporary DL card doesn't have barcode or hologram. And it can be printed by myself as well. So I think it's possible as long as you can print them for me. [W]hat is your thought?
>
> CHAPMAN: If I'm just printing and sending. . . .
>
> Chong: Great. . . .
> [MEDIA ITEM: image:2023_08_28T18_47_34_462Z.png]
> Just one more thing, is this the right form of Alabama temporary DL card? Do you have any of idea?
>
> CHAPMAN: I guess. It's the same image I get when I Google.
>
> Chong: Thanks. . . . Hi Christina. Please print follow documents.
> [MEDIA ITEM: Drug Screen Registration.pdf]
> [MEDIA ITEM: Stephen Kyle C[]TemporaryDL.pdf]
> [MEDIA ITEM: Clinic Authorization Form – AOH C[].pdf]
> Please print them and send to this address – [Address] Brooklyn NY. Please share tracking number once you've finished. . . .
>
> CHAPMAN: Just waiting for a pick up [sic].

- ***Employment in United States Through CHAPMAN's Laptop Farm & Other Assistance***

v. On or about the following dates, coconspirator overseas IT workers obtained employment and performed remote IT work for U.S. companies, while the laptops provided for this work were hosted by CHAPMAN at a laptop farm in one of her residences:

| Sub-¶ | Start Date | U.S. Person Identity | Victim Company (if known) | Staffing Company (if applicable) | Total Wages (if known) |
|---|---|---|---|---|---|
| 1 | 7/5/2022 | "Asolelei T." | Company 10 | | $156,826.00 |
| 2 | 5/31/2023 | "Brian S." | Company 11 | | $88,061.00 |
| 3 | 6/12/2023 | "Brian S." | Company 12 | Staffing Company 10 | |
| 4 | 4/14/2022 | "Charles C." | | Staffing Company 11 | $208,562.00 |
| 5 | 9/26/2023 | "Cody W." | Company 13 | | $7,269.92 |
| 6 | 9/25/2023 | "Cody W." | Company 14 | Staffing Company 12 | |
| 7 | 4/17/2023 | "Curtis W." | Company 7 | Staffing Company 15 | |
| 8 | 5/1/2023 | "Curtis W." | Company 15 | Staffing Company 13 | |
| 9 | 4/30/2023 | "Danie P." | Company 16 | | |
| 10 | 11/21/2022 | "Daniel B." | Company 1 | | $121,213.00 |
| 11 | 10/31/2022 | "Daniel B." | Company 17 | | $3,889.00 |
| 12 | 10/31/2022 | "Daniel B." | Company 18 | | |
| 13 | 5/31/2023 | "Darius W." | Company 19 | | |
| 14 | 10/31/2023 | "Darius W." | | Staffing Company 11 | $11,011.00 |
| 15 | 5/15/2023 | "Darius W." | Company 20 | | $67,084.00 |
| 16 | 4/7/2022 | "David S." | Company 4 | Staffing Company 3 | $86,778.00 |
| 17 | 10/3/2023 | "Dong C." | Company 21 | Staffing Company 14 | $8,568.00 |
| 18 | 9/18/2023 | "Dong C." | | Staffing Company 9 | $8,639.00 |
| 19 | 3/21/2022 | "Dung N." | | Staffing Company 16 | $101,646.35 |
| 20 | 4/14/2022 | "Frank C." | Multiple, including Company 6 | Staffing Company 5 | $214,596.00 |
| 21 | 8/7/2023 | "Frank C." | Company 7 | Staffing Company 6 | $40,320.00 |
| 22 | 7/18/2022 | "Frank C." | Company 22 | Staffing Company 17 | $115,248.00 |
| 23 | 3/31/2023 | "Frank C." | Company 23 | | |

| 24 | 5/9/2022 | "Guillermo C." | Company 24 | Staffing Company 3 | $41,175.00 |
|---|---|---|---|---|---|
| 25 | 5/23/2022 | "Guillermo C." | Company 25 | Staffing Company 33 | $81,004.00 |
| 26 | 4/20/2023 | "Guillermo C." | Company 26 | | |
| 27 | 5/11/2022 | "Guillermo C." | Company 27 | Staffing Company 18 | $17,150.00 |
| 28 | 11/5/2022 | "Irving B." | Company 28 | Staffing Company 19 | $60,551.22 |
| 29 | 9/5/2023 | "Jade H." | Company 29 | | $23,017.00 |
| 30 | 10/16/2023 | "Jade H." | Company 30 | | |
| 31 | 1/4/2023 | "Jamal M." | Company 31 | | |
| 32 | 7/24/2023 | "James B." | Company 32 | Staffing Company 31 | $14,400.00 |
| 33 | 5/26/2022 | "JungWoo L." | | Staffing Company 16 | $9,135.00 |
| 34 | 1/30/2023 | "Kentrell M." | Company 33 | | |
| 35 | 1/31/2023 | "Kentrell M." | Company 34 | Staffing Company 32 | |
| 36 | 6/16/2023 | "Kevin S." | Company 2 | Staffing Company 1 | $35,815.00 |
| 37 | 10/18/2021 | "Kou T." | Company 35 | Staffing Company 20 | |
| 38 | 10/17/2022 | "Lee Y." | Company 36 | | $3,553.34 |
| 39 | 6/27/2022 | "Lee Y." | Company 37 | | |
| 40 | 8/29/2022 | "Lee Y." | Company 38 | | $130,661.07 |
| 41 | 10/24/2022 | "Lee Y." | Company 39 | | |
| 42 | 9/30/2022 | "Marcus M." | Company 40 | | |
| 43 | 3/20/2023 | "Marcus M." | Company 9 | Staffing Company 3 and Staffing Company 27 | |
| 44 | 9/26/2022 | "Marcus M." | Company 41 | | $9,225.00 |
| 45 | 1/17/2022 | "Matthew L." | Company 42 | Staffing Company 5 | |
| 46 | 5/31/2022 | "Matthew L." | Company 43 | | |
| 47 | 4/3/2023 | "Matthew R." | Company 44 | | $76,923.00 |
| 48 | 4/26/2023 | "Royd L." | | Staffing Company 8 | |

| 49 | 8/2/2023 | "Ryan F." | Company 5 | Staffing Company 4 | $36,586.00 |
|---|---|---|---|---|---|
| 50 | 7/31/2023 | "Ryan F." | Company 45 | Staffing Company 21 | $31,777.00 |
| 51 | 9/18/2023 | "Ryan F." | Company 46 | | |
| 52 | 6/6/2022 | "Ryan S." | | Staffing Company 3 | |
| 53 | 4/11/2022 | "Salem O." | Company 47 | | $83,620.00 |
| 54 | 4/25/2023 | "Scott L." | Company 48 | | $81,250.00 |
| 55 | 6/26/2023 | "Scott L." | Company 49 | | |
| 56 | 7/24/2023 | "Sion W." | | Staffing Company 7 | $24,378.00 |
| 57 | 4/8/2022 | "WeiChong C." | Company 50 | | $234,840.00 |
| 58 | 7/19/2022 | "William P." | Company 51 | Staffing Company 22 | $63,280.00 |
| 59 | 10/2/2023 | "Willy E." | Company 7 | Staffing Company 22 | |
| 60 | 11/30/2022 | Unknown | Company 52 | | |
| Total | | | | | $2,298,051.90 |

**Company 1**

w. On or about November 21, 2022, a coconspirator overseas IT worker using the U.S. identity "Daniel B." obtained a job at Company 1 for a remote position as a software engineer for Company 1's digital streaming service, see supra ¶ 23(b)(i). The coconspirator overseas IT worker provided CHAPMAN's address to Company 1's Human Resources department as his permanent residence.

x. On or about November 16, 2022, CHAPMAN received a package addressed to "Daniel B." containing a laptop for his employment at Company 1. CHAPMAN affixed a hand-written note with the name of "Daniel B." and Company 1 on the laptop.

y. On November 21, 2022, CHAPMAN messaged with coconspirator AT, wherein they discussed CHAPMAN's assistance with setting up the laptop for AT to work at Company 1. After running through the process of getting the laptop set up for use (to include exchanging log-in credentials for the laptop), CHAPMAN installed AnyDesk, a remote login application, and stated:

> CHAPMAN: This computer SHOULD have been loaded with the necessary software. Can you control?
>
> AT: Yes, I can control. [Company 1] Anydesk is not available, I think it's probably screen lock issue. Could you please remove Anydesk and install it again inside download? and please unlock screensavor [sic] forever. . . .
>
> AT: Hi, please help me, it's very urgent. I have to meet team in 30 mins.

CHAPMAN then responded to AT and helped with the AnyDesk re-download.

z. Between on or about November 22, 2023, and on or about November 23, 2023, CHAPMAN had further messages with AT about technical assistance for the Company 1's laptop:

> AT: Could you follow these for [Company 1]'s laptop? I can not [sic] do these by myself because it requires to do restart. . . .
>
> AT: We are going to have laptop setup meeting in 20 mins. Can you join Teams meeting and follow what IT guy say? Because it will require to restart laptop multiple times and I can not [sic] handle that. You can mute and just follow what they say, they have access to entire screen and will control of most of things without you. However, you have to restart it inevitably . . . .
>
> AT: You can join Teams meeting from your phone or your own laptop. . . .
>
> CHAPMAN: Who do I say I am?
>
> AT: You don't have to say, I will be joining there too.
>
> CHAPMAN: It's going to have my name on it, right?
>
> AT: You just mute and listen, then follow what she instruct, she may ask you

to restart laptop. . . .

CHAPMAN: I just typed in the name Daniel. If they ask WHY you are using two devices, just say the microphone on your laptop doesn't work right.

AT: Ok

CHAPMAN: Most IT people are fine with that explanation.

**Company 2 / Staffing Company 1**

aa. On or about June 16, 2023, a coconspirator overseas IT worker using the U.S. identity "Kevin S." obtained a position at Staffing Company 1 for a remote position as a software engineer. The resume for "Kevin S." included a list of skills to include "Python," a programming software, see supra ¶ 23(b)(ii).

bb. On or about July 17, 2023, "Kevin S." began a contractor assignment at Company 2, a health care administration company located in Missouri.

cc. On or about July 13, 2023, CHAPMAN received a package addressed to "Kevin S." at her residence, which included a Company 2 laptop for remote work. CHAPMAN affixed a hand-written note with the name of "Kevin S." and Company 2's name on the laptop.

**Company 3 / Staffing Company 2**

dd. On or about May 17, 2022, CHAPMAN exchanged communications with a user listed as "Mobile & Web Projects" ("M&W") related to a laptop for a job contracted through Staffing Company 2, see supra ¶ 23(b)(iii). M&W told CHAPMAN that a laptop would soon be arriving from Company 3 / Staffing Company 2 and to "ping me" when it arrived.

ee. On or about May 19, 2022, CHAPMAN confirmed that the Company 3 / Staffing Company 2 laptop had arrived.

ff. On or about May, 20 2022, CHAPMAN and M&W messaged about the setup process for this laptop, to include installing AnyDesk.

**Company 4 / Staffing Company 3**

gg. On or about April 7, 2022, a coconspirator overseas IT worker using the U.S. identity "David S.," who had obtained employment at a staffing company, Staffing Company 3, was assigned to a remote position at Company 4, a Fortune 500 Silicon Valley technology company. CHAPMAN received a Company 4 laptop for "David S." at her residence and maintained it there.

hh. On or about April 11, 2022, CHAPMAN messaged with a coconspirator overseas IT worker using the screenname "BH." BH asked, "Any laptop was delivered under 'David S.'?" CHAPMAN responded that it had arrived. BH wrote, "I want to access that remotely You know how to install Anydesk?" CHAPMAN responded, "I do it practically EVERYDAY!" CHAPMAN then installed AnyDesk and set up the laptop for remote work. BH later confirmed that the set up worked and he was able to control the laptop remotely.

**Company 5 / Staffing Company 4**

ii. On or about August 2, 2023, a coconspirator overseas IT worker using the U.S. identity "Ryan F.," who had obtained employment at Staffing Company 4, a staffing company, was assigned to a remote position at Company 5. CHAPMAN received a Staffing Company 4 laptop at her residence.

jj. On or about September 26, 2023, Company 5 sent a company-issued laptop to "Ryan F." to CHAPMAN's residence, which had a PIV card, issued by Company 5 in the name of "Ryan F.", associated with it.

**Company 6 / Staffing Company 5**

kk. On or about April 14, 2022, a coconspirator overseas IT worker using the U.S. identity "Frank C." obtained a remote IT position at a staffing company, Staffing Company 5.

ll. On or about February 6, 2023, "Frank C.," still being employed by Staffing Company 5, was contracted to Company 6, a Fortune 500 iconic American automotive manufacturer located in Detroit, Michigan.

mm. Between on or about February 6, 2023, and on or about February 8, 2023, CHAPMAN messaged with an individual referred to as "Web Dev" ("WD"), regarding the delivery of the Company 6 laptop.

nn. On or about February 8, 2023, CHAPMAN received a shipment addressed to "Frank C." at CHAPMAN's residence, which included a laptop for remote work at Company 6. CHAPMAN affixed a hand-written note with "Frank C.'s" name and log-in information on the laptop.

oo. On or about February 14, 2023, WD and CHAPMAN messaged about the Company 6 laptop:

> WD: And could we do the computer setup for [Company 6] company computer?. . . And could we connect my [Company 6] computer zoom to Steve's apple computer zoom link? (Because apple computer zoom is no use so I am gonna use it for [Company 6] computer)
>
> please join [Company 6] computer to this zoom.
> Meeting Link: *** *** 5266
> Passcode: ****xc
>
> CHAPMAN: I created a second desktop on [Company 6] for zoom, just in case.
>
> WD: Cool. How did you pass this step? What admin username and password did you use? This one I mean.

CHAPMAN: I rarely have issues installing Zoom in computers. . . . Anydesk is what required an admin username and password, not Zoom.

WD: Oh. I got it. . . . And for [Company 6] compute[sic], it is showing zoom controlling alert now. . . .That seems due to my developer joined. . . . Anyway to hide it in my way?

CHAPMAN: Controlling alert.

**Company 7 / Staffing Company 6**

pp. On or about August 1, 2023, a coconspirator overseas IT worker using the U.S. identity "Frank C." obtained employment with a staffing company, Staffing Company 6, and was contracted for a remote IT position at Company 7, a Fortune 500 high-end retail store with multiple U.S. locations.

qq. On or about July 27, 2023, CHAPMAN messaged with an individual referred to as "Project Manager" ("PM"), about the laptop for Company 7 being delivered to CHAPMAN's address.

rr. On or about July 31, 2023, CHAPMAN received a shipment to "Frank C." at CHAPMAN's residence, which included a Company 7 laptop for remote work. CHAPMAN affixed a hand-written note with the name "Frank C." and "Company 7."

ss. On or about August 3, 2023, after the laptop arrived at CHAPMAN's residence, CHAPMAN and PM argued over a messaging application about whether CHAPMAN would set up the laptop that day, given her prior promises to set up laptops for other overseas IT workers:

CHAPMAN: I didn't say setup should be today. . . . I'll tell the other people who start TOMORROW morning, that Yuri says he's more important . . . . Will they know you are Yuri over there?

> PM: Let me know who is planed [sic] for today, I will have a talk with them. Yes.
>
> CHAPMAN: Because I don't know who is on who's team, or who know about each other… I can't reveal other names. I got some people in trouble for that before.

**Company 8**

tt. On or about October 16, 2023, a coconspirator overseas IT worker using the U.S. identity "Darius W." obtained a remote software engineer position at Company 8, a restaurant chain headquartered in Michigan. As a software engineer, "Darius W." had access to sensitive segments of Company 8 servers. "Darius W." requested the Company 8 laptop be sent to CHAPMAN's residence.

uu. On or about October 24, 2023, "Darius W." took leave, claiming that his father had fallen ill. He did not return to work following his absence and continued his unpaid leave.

vv. Between on or about October 16, 2023, and on or about November 9, 2023, "Darius W." accessed and downloaded large amounts of information from Company 8 servers.

**Company 9**

ww. Beginning on or about March 20, 2023, a coconspirator overseas IT worker using U.S. identity "Marcus M.," who had obtained employment at a staffing company, was contracted to Company 9, a classic American clothing brand headquartered in California, for a remote position. Company 9 sent a shipment to "Marcus M." at CHAPMAN's residence, which included a laptop for remote work.

xx. Between on or about September 9, 2023, and on or about October 4, 2023, "Marcus M.," caused what appeared to be 15 separate exfiltrations of data from IP addresses, which appeared to resolve to a location in Nigeria.

**Attempts at U.S. Government Agencies**

yy. On or about June 29, 2023, a coconspirator overseas IT worker using the U.S. identity "Sion W." obtained employment at Staffing Company 7, a staffing company, to work in a contractor remote position with the DHS Immigration and Customs Enforcement ("ICE"), a U.S. Government Agency located in the District of Columbia. "Sion W." provided CHAPMAN's residence as the home address on the DHS paperwork. Subsequently, on or about October 24, 2023, Staffing Company 7 HR staff reached out to "Sion W." stating that they needed to speak about "identity issues" and needed "Sion W.'s" birth certificate or passport. DHS/ICE required fingerprints be submitted for its contractor positions. "Sion W." did not submit fingerprints, was not verified to work as a contractor for DHS/ICE.

zz. On or about April 25, 2023, a coconspirator overseas IT worker using the U.S. identity "Royd L." obtained employment at Staffing Company 8, a staffing company, to work in a contractor remote position with DHS Federal Protective Service ("FPS"). "Royd L." listed CHAPMAN's address on his application for employment with Staffing Company 8. Subsequently, on or about April 27, 2023, DHS/FPS provided "Royd L." forms and instructions necessary for "Royd L." to complete his background check for the contractor position, including information for scheduling a required fingerprint examination.

aaa. On or about May 3, 2023, "Royd L." informed Staffing Company 8 that he had a death in the family and would not be available for a week.

bbb. On or about May 8, 2023, "Royd L." informed Staffing Company 8 that he was quitting the job due to the need to stay to support his family.

ccc. On or about September 27, 2023, a coconspirator overseas IT worker using the U.S. identity "Dong C.," who had obtained employment at a staffing company, Staffing Company 9, was contracted for a remote IT position to the General Services Administration ("GSA"), a U.S. Government Agency located in the District of Columbia. "Dong C." provided CHAPMAN's address as his home address to the staffing company and listed "Christina" as his "spouse."

ddd. On or about September 27, 2023, "Dong C." virtually attended a GSA staff meeting but was unable to communicate besides introducing himself. Thereafter, he attended several other meetings without speaking and was otherwise unable to be reached. On or about October 2, 2023, GSA staff made the determination to terminate "Dong C." as a contractor.

**Other Assistance Provided by CHAPMAN to Overseas IT Workers**

eee. On or about February 25, 2022, CHAPMAN provided technical assistance to coconspirator overseas IT workers over messaging applications. CHAPMAN messaged with Zhonghua about logging into a laptop. CHAPMAN attempted to log into the laptop using the username and password that Zhonghua provided to her. CHAPMAN told Zhonghua that they had already tried to log in using those login credentials. Zhonghua asked her to try it again and CHAPMAN sent an image of a laptop screen which showed the username or password was

incorrect and told Zhonghua, "We are locked out again. Please verify."

fff. On or about March 24, 2022, CHAPMAN messaged with Zhonghua, wherein Zhonghua requested CHAPMAN's assistance in obtaining an IRS Wage and Tax Statement ( a Form W-2 or "W-2") for a coconspirator overseas IT worker "Matthew" and sought samples of W-2s as it was "really important for our work."

ggg. On or about the following dates, CHAPMAN furthered the Conspiracy by sending laptops and other devices issued by U.S. companies to the following overseas locations, to facilitate remote work at U.S. companies, including to Dandong, China, a city on the border with North Korea:

| Sub-¶ | Date | Receiver Name | Receiver Location | Shipment Description |
|---|---|---|---|---|
| 1 | 12/9/2022 | JIN | Dandong, China | Laptops - Computer Laptop |
| 2 | 12/9/2022 | JIN | | Laptops - Computer Laptop |
| 3 | 12/16/2022 | JIN | | Laptops - Work Laptop. Not |
| 4 | 12/16/2022 | JIN | | Laptops - Work Laptop. Not |
| 5 | 12/20/2022 | IT Worker 1 | | Laptops - 1 Used Apple Laptop |
| 6 | 12/20/2022 | IT Worker 1 | | Laptops - 1 Used Apple Laptop |
| 7 | 12/20/2022 | IT Worker 1 | | Laptops - 1 Used Apple Laptop |
| 8 | 12/23/2022 | JIN | | Laptops - Used Laptop |
| 9 | 12/23/2022 | JIN | | Laptops - Used Laptop |
| 10 | 12/23/2022 | JIN | | Laptops - Used Laptop |
| 11 | 1/12/2023 | XU | | Computer |
| 12 | 1/12/2023 | XU | | Computer |
| 13 | 1/12/2023 | JIN | | Computer |
| 14 | 1/12/2023 | JIN | | Computer |
| 15 | 1/18/2023 | JIN | | Phone |
| 16 | 1/18/2023 | JIN | | Phone |
| 17 | 2/6/2023 | JIN | | Computer |
| 18 | 2/6/2023 | JIN | | Computer |
| 19 | 2/22/2023 | JIN | | Computer |

| | | | | |
|---|---|---|---|---|
| 20 | 2/22/2023 | JIN | Dandong, China | Computer |
| 21 | 3/16/2023 | JIN | | Used Samsung Tablet USB AC ADA |
| 22 | 3/16/2023 | JIN | | Used Samsung Tablet USB AC ADA |
| 23 | 3/16/2023 | XU | | Refurbished Samsung Galaxy Mob |
| 24 | 3/16/2023 | XU | | Refurbished Samsung Galaxy Mob |
| 25 | 4/1/2023 | XU | | Computer |
| 26 | 4/1/2023 | XU | | Computer |
| 27 | 4/6/2023 | IT Worker 2 | Karachi, Pakistan | |
| 28 | 4/6/2023 | IT Worker 3 | Yanji City, China | Company 16 TV Stick |
| 29 | 4/6/2023 | IT Worker 3 | | Company 16 TV Stick |
| 30 | 4/10/2023 | XU | Dandong, China | Computer |
| 31 | 4/10/2023 | XU | | Computer |
| 32 | 4/19/2023 | JIN | | Cell Phones - 2 Used Cell |
| 33 | 4/19/2023 | JIN | | Cell Phones - 2 Used Cell Phon |
| 34 | 5/2/2023 | IT Worker 4 | Shenyang, China | Used Macbook Computer |
| 35 | 5/2/2023 | IT Worker 4 | | Used Macbook Computer |
| 36 | 5/3/2023 | IT Worker 5 | Karachi, Pakistan | Computer |
| 37 | 5/13/2023 | IT Worker 6 | Dubai, UAE | Computer |
| 38 | 5/13/2023 | IT Worker 6 | | Computer |
| 39 | 5/18/2023 | IT Worker 7 | Karachi, Pakistan | |
| 40 | 5/30/2023 | IT Worker 8 | Abuja, Nigeria | Computer |
| 41 | 5/31/2023 | IT Worker 8 | | Laptops - Laptop, Not for Re S |
| 42 | 6/13/2023 | IT Worker 9 | Dandong, China | Mac Laptop |
| 43 | 6/13/2023 | IT Worker 9 | | Mac Laptop |
| 44 | 7/8/2023 | JIN | | Laptops - 2 Used Laptops. Not |
| 45 | 7/19/2023 | XU | | Laptops - 1 Laptop for business |
| 46 | 7/19/2023 | XU | | Laptops - 1 Laptop for business |
| 47 | 7/22/2023 | IT Worker 7 | Karachi, Pakistan | Laptops - 1 Laptop For business |
| 48 | 8/29/2023 | IT Worker 10 | Shenyang, China | Computer - New Mac Apple |
| 49 | 8/29/2023 | IT Worker 10 | | Computer - New Mac Apple |

- ***Transmission of False Employment Data to IRS and SSA***

hhh. Between on or about January 1, 2022, and on or about January 31, 2024, the coconspirators caused U.S. companies to transmit false wage and tax information on more than 100 occasions to the SSA and the IRS for the wages earned by the overseas IT workers under the scheme, in the name of the following U.S. persons, when those U.S. persons did not in fact earn such wages and which the U.S. companies did not know was associated with stolen or borrowed U.S. identities:

| Sub-¶ | U.S. Person | 2021 Wages | 2022 Wages | 2023 Wages | Total False Wages Reported |
|---|---|---|---|---|---|
| 1 | "Asolelei T." | $62,137.00 | $486,728.00 | $265,911.00 | $814,776.00 |
| 2 | "Breeyan C." | | $21,280.00 | $56,973.00 | $78,253.00 |
| 3 | "Brett S." | | $28,110.00 | $94,865.00 | $122,975.00 |
| 4 | "Brian S." | | | $88,061.00 | $88,061.00 |
| 5 | "Charles C." | | $106,444.00 | $114,280.00 | $220,724.00 |
| 6 | "Chuck C." | $103,444.00 | $183,212.00 | | $286,656.00 |
| 7 | "Cody W." | | $9,053.00 | $41,520.00 | $50,573.00 |
| 8 | "Daniel B." | | $40,396.00 | $114,320.00 | $154,716.00 |
| 9 | "Daniel M." | | $1,457.00 | $27,691.00 | $29,148.00 |
| 10 | "Darius W." | | | $176,296.00 | $176,296.00 |
| 11 | "David S." | $160,580.00 | $403,640.00 | | $564,220.00 |
| 12 | "Dong C." | | $22,037.00 | $26,347.00 | $48,384.00 |
| 13 | "Dustin S." | | $23,539.00 | $22,582.00 | $46,121.00 |
| 14 | "Frank C." | $12,183.00 | $468,463.00 | $471,463.00 | $952,109.00 |
| 15 | "Guillermo C." | $202,161.00 | $409,005.00 | | $611,166.00 |
| 16 | "Jack W." | | | $11,592.00 | $11,592.00 |
| 17 | "Jacob L". | | $150,569.00 | $17,508.00 | $168,077.00 |
| 18 | "Jade H." | | | $23,017.00 | $23,017.00 |
| 19 | "James B." | | | $43,782.00 | $43,782.00 |
| 20 | "Jared G." | $32,015.00 | $10,707.00 | $19,639.00 | $62,361.00 |
| 21 | "Joseph P." | | | $67,265.00 | $67,265.00 |
| 22 | "JungWoo L." | | $85,802.00 | | $85,802.00 |
| 23 | "Kevin S." | | | $195,093.00 | $195,093.00 |

| | | | | | |
|---|---|---|---|---|---|
| 24 | "Lamar M." | | | $8,249.00 | $8,249.00 |
| 25 | "Marcus M." | | $81,173.00 | $211,403.00 | $292,576.00 |
| 26 | "Matthew R." | | $70,329.00 | $88,043.00 | $158,372.00 |
| 27 | "Michael G." | | $46,996.00 | $9,497.00 | $56,493.00 |
| 28 | "Michael P." | | $9,511.00 | | $9,511.00 |
| 29 | "Nathanael D." | | | $1,103.00 | $1,103.00 |
| 30 | "Ruben G." | | | $4,419.00 | $4,419.00 |
| 31 | "Ryan F." | | | $119,034.00 | $119,034.00 |
| 32 | "Salem O." | | $83,620.00 | | $83,620.00 |
| 33 | "Shunquez L." | $23,138.00 | $75,500.00 | $75,500.00 | $174,138.00 |
| 34 | "Sion W." | | | $24,378.00 | $24,378.00 |
| 35 | "Steven L." | | | $112,262.00 | $112,262.00 |
| 36 | "Tavaris B." | | | $115,180.00 | $115,180.00 |
| 37 | "Thomas K." | | $1,153.00 | | $1,153.00 |
| 38 | "WeiChong C." | | $131,889.00 | $129,873.00 | $261,762.00 |
| | *Totals* | $595,658.00 | $2,950,613.00 | $2,777,146.00 | $6,323,417.00 |

(**Conspiracy to Defraud the United States**, in violation of Title 18, United States Code, Section 371)

**COUNT TWO**
(Conspiracy to Commit Wire Fraud)

24. The allegations in Paragraphs 1 through 23 of this Indictment are incorporated and re-alleged by reference herein.

25. Between in or around March 2021, until on or about October 26, 2023, CHAPMAN and others known and unknown to the Grand Jury, in the District of Columbia and elsewhere, knowingly combined, conspired, and agreed together and with each other to devise and intended to devise a scheme to defraud U.S. company employers and DHS through the transmission of false information, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in

interstate commerce the signals and sounds as described in Count One.

(**Conspiracy to Commit Wire Fraud**, in violation of Title 18, United States Code, Sections 1343 & 1349)

**COUNT THREE**
(Conspiracy to Commit Bank Fraud)

26. The allegations in Paragraphs 1 through 23 of this Indictment are incorporated and re-alleged by reference herein.

27. Between on or about November 30, 2021, until on or about October 26, 2023, CHAPMAN and others known and unknown to the Grand Jury, in the District of Columbia and elsewhere, knowingly combined, conspired, and agreed together and with each other to execute and attempt to execute a scheme and artifice (i) to defraud a financial institution, as defined in 18 U.S.C. § 20; and (ii) to obtain money, funds, credits, assets, securities, and other property owned by and under the custody and control of, a financial institution as defined in 18 U.S.C. § 20, by means of false and fraudulent pretenses, representations, and promises, *to wit*, by impersonating U.S. persons, forging check endorsements, and causing U.S. companies to make deposits in the names of individuals who were falsely associated with the transactions, and thereby causing the banks to unknowingly process transactions to or for the benefit of foreign individuals and entities, including North Korea.

28. In furtherance of this Conspiracy and to accomplish its goals, the following overt acts, in addition to those previously alleged, among others, were committed in the District of Columbia and elsewhere:

***Fraud Directed Toward USFI-3***

29. On or about November 30, 2021, CHAPMAN messaged with a coconspirator overseas IT worker using the screenname "Piety," wherein they discussed a scheme to deposit

wages into CHAPMAN's account at USFI-3, an FDIC-insured U.S. financial institution, and submit false information to the bank related to the same:

> CHAPMAN: You are Jerry P[.], correct?
>
> Piety: Yes.
>
> CHAPMAN: What's should I do about your payroll check that came here? . . . Where was your check supposed to go?. . .
>
> Piety: was it shipped to your house? . . .
>
> CHAPMAN: Yes. That's why I have it. Sometimes, if you don't have your direct deposit paperwork in quickly enough, the very first check won't make it in to three bank. I'm not sure how to get out to you. . . .WHERE is your bank? . . . I should be able to write your bank account number on the check and send it to your bank then it will be deposited.
>
> Piety: . . . [USFI-3 Name, Address, Routing, Account Information]
>
> CHAPMAN: Okay. I should be able to deposit your check at any [USFI-3] then. Awesome!! That issue is solved.
>
> Piety: how do you handle it?
>
> CHAPMAN: I will write ' For deposit only to account [number] where the signature would go and give it to the teller. . . . Are you there?!?!! I'm at the bank now with your check. Is the account in your name? I need to know.
>
> Piety: hi. No. 1 sec.
>
> CHAPMAN: What name is on the account?? I need to know.
>
> Piety: Anastasiia [D.] it's owner name . . .

***Fraud Directed Toward USFI-1***

30. On or about June 28, 2022, CHAPMAN messaged with a coconspirator overseas IT worker JJ, wherein they discussed a scheme to deposit checks for overseas IT workers' wages into CHAPMAN's account at USFI-1, an FDIC-insured U.S. financial institution, and submit false information to the bank related to the same:

> JJ: Is it possible to use your bank account for getting payment from one of the company? . . .
>
> CHAPMAN: I'm working on finding out what kind of bank account I need to do that without issue though.
>
> JJ: This is a new company so you don't need to worry about having trouble. I only need to get payment with your bank account once or twice. Meanwhile, I will create my own account and change it.
>
> CHAPMAN: And do you know what happens when my bank account gets flagged by the federal government for processing to many large payments and sending them overseas? I get in trouble and go to prison. I have to make sure I am doing it the right way. . . .
>
> JJ: I totally understand your concern. Sorry to bother you.
>
> CHAPMAN: It's okay. I'm waiting on answers form a bank manager to make sure I can do it without getting in trouble. It will just take a couple days to find out.

31. On or about March 17, 2023, CHAPMAN messaged with a coconspirator overseas IT worker using the screenname "WebHamster" ("WH"), wherein they discussed a scheme to deposit checks for overseas IT workers' wages into CHAPMAN's account at USFI-1 and submit false information to the bank related to the same:

> WH: They are saying they sent another paper check on 2/3, any paper check you received? and would you find someone who can help with physical paper checks, i will pay 30% fee, if needed. the problem is that "Irving B." isn't real person's name. it would be great if you could spare me just a few mins to discuss about the paper checks.
>
> CHAPMAN: That's probably why it didn't go through my bank as the name is fake. I could go to prison for fraud for that. . . . So, Irving is not a real person at all?
>
> WH: No. any possibility? . . .
>
> CHAPMAN: I am willing to try one more time. But I don't have another check. A second one never came here.
>
> WH: I will check with the company, but you could try with the one which be arrived soon. It will be about 3.8k. and 30% will be paid as fee.

32. On or about the following dates, after endorsing the check issued in the name of a beneficiary other than herself and signing the check for deposit, CHAPMAN deposited the following payroll checks into her USFI-1 account via the bank's mobile deposit feature:

| Sub-¶ | Date of Check | Date of Deposit | U.S. Company | Pay To Order | Amount |
|---|---|---|---|---|---|
| a. | 9/15/2022 | 9/27/2022 | Company 54 | "Lee Y." | $ 3,328.58 |
| b. | 9/15/2022 | 9/30/2022 | Company 54 | "Lee Y." | $ 4,886.26 |
| c. | 9/30/2022 | 10/11/2022 | Company 54 | "Lee Y." | $ 4,886.27 |
| d. | 1/27/2023 | 3/6/2023 | Staffing Company 34 | "Guillermo C." | $ 2,367.34 |
| e. | 2/9/2023 | 3/24/2023 | Staffing Company 28 | "Frank A." | $ 4,175.23 |
| f. | 3/15/2023 | 3/28/2023 | Company 28 - Staffing Company 19 | "Irving B." | $ 3,840.17 |
| g. | 3/31/2023 | 4/12/2023 | Company 28 - Staffing Company 19 | "Irving B." | $ 3,840.08 |
| h. | 4/3/2023 | 4/25/2023 | Staffing Company 29 | "Lee Y." | $ 2,179.53 |
| i. | 3/6/2023 | 5/1/2023 | Staffing Company 30 | "Asolelei T." | $ 4,551.65 |
| j. | 4/11/2023 | 5/17/2023 | Company 1 | "Daniel B." | $ 4,379.36 |
| k. | 5/15/2023 | 5/19/2023 | Company 28 / Staffing Company 19 | "Irving B." | $ 3,840.17 |
| l. | 4/13/2023 | 6/7/2023 | Company 28 / Staffing Company 19 | "Irving B." | $ 3,899.65 |
| m. | 2/28/2023 | 6/12/2023 | Company 53 | "Matthew R." | $ 960.44 |
| n. | 5/31/2023 | 6/20/2023 | Company 28 / Staffing Company 19 | "Irving B." | $ 3,840.09 |
| o. | 6/16/2023 | 7/6/2023 | Company 1 | "Daniel B." | $ 4,713.87 |
| p. | 7/20/2023 | 8/3/2023 | Staffing Company 27 | "Marcus M." | $ 3,264.00 |
| q. | 6/27/2023 | 8/14/2023 | Staffing Company 15 | "Kentrell M." | $ 2,318.19 |
| | | | | Total | $ 61,270.88 |

***Fraud Directed Toward USFI-2***

33. Between on or about October 5, 2023, and on or about October 6, 2023, CHAPMAN messaged with a coconspirator overseas IT worker using the screenname "Tommy," wherein they discussed a scheme to deposit wages into CHAPMAN's account at USFI-2, an FDIC-insured U.S. financial institution, and submit false information to the bank related to the same:

> CHAPMAN: I haven't heard a single word from you today. I needed to give the bank that information today. . . .
>
> Tommy: Could you please let me know your phone number.
> I need to know your phone number at least while bank calls me.
>
> CHAPMAN: 763-[XXX-XXXX].
>
> Tommy: No worries. You only helped your friend Andy. . . .
>
> CHAPMAN: You have to say that we've met in person and worked together. . . . You ABSOLUTELY have to say we've met and worked together. And I won't be able to use this account again for your direct deposit. This bank said it's against their rules.

34. On or about October 11, 2023, CHAPMAN continued the conversation with "Tommy" related to the scheme to deposit wages into CHAPMAN's account at USFI-2:

> CHAPMAN: They can't use the number you gave me because it's a V[oice] O[ver] IP number. They need a physical regular number that is tied to his name and comes up WITH his name. . . .
>
> Tommy: Okay. Let me know your another [sic] [MST-2] address. I will pay. I have just checked with Andy. . . .As you know, Andy has only VOIP phone right now because he was Chineese [sic] guy. . . .or can you tell me bank assist's number please? . . .then we will let [Company 56] manager who is real call bank assist and confirm. . . .
>
> CHAPMAN: The bank said only Andy, calling from a real number can confirm that the money was meant to go into my account. . . .
>
> Tommy: then we can prepare one of my US friend. he has real US number and can pretend to be Andy. I will provide all information about Andy to him. What do you think?

> CHAPMAN: It HAS to be in the name Andy P[.]. . . .
>
> Tommy: Make sense. You mean the real phone number which I will give you should be connected name which is Andy P[.]? I think it's impossible . . . .
>
> CHAPMAN: Your friend here needs to go get a sim card, saying he's buying it for his friend Andy P[.] so it gets put in his name. If the bank asks about the new number, he can just say he moved recently. Then that sim card can be put in an extra phone for the phone call/s. I told the bank that I usually talked to Andy via [Messaging Application-1] because it was easier as we moved and traveled for work. Alternatively, your friend can get a Lan line in Andy's name. You guys obviously have a social security number for him. That would be registered in his name.
>
> Tommy: Ok. Let me try.

35. On or about October 13, 2023, "Tommy" relayed to CHAPMAN that they had purchased a phone with a Subscriber Identity Module ("SIM") card in "Andy's" name, and that they were "preparing" a "story."

36. Between on or about October 15, 2023, and on or about October 19, 2023, CHAPMAN continued the conversation with "Tommy" related to the scheme to deposit wages into CHAPMAN's account at USFI-2:

> Tommy: 385[XXXXXXX]. This is phone number. I will let you know when he is ready to answer. Let's confirm again. Andy and you are friends and have worked some stuffs in person. Andy had some issues about bank so made a decision to use your bank. Right?
>
> CHAPMAN: Yes. We worked together in person before and became friends... so I offered to help when he mentioned his bank issue.
>
> Tommy: Okay.
>
> CHAPMAN: I'll call the bank tomorrow. That department isn't open this late. . . .
>
> Tommy: Did you call the bank btw?
>
> CHAPMAN: Yes. I've called. Have they contacted your friend yet?

Tommy: Not yet.

CHAPMAN: I'll call again tomorrow. . . .

CHAPMAN: I'm losing my account and no longer eligible to have accounts at [USFI-2]. There will be a balance owed because I already sent you money. The ONLY thing that can fix this is Andy P[.] going into a [USFI-2] location and showing his idea and saying he asked to have his money deposited into my account. . . .

Tommy: I will prepare my friends to visit at the [USFI-2] with Andy's id. . . .

CHAPMAN: We need someone who looks like Andy.

Tommy: I will let andy [sic] call first and if it didn't go well, will let company manager call the bank. if it's also not going well, we can choose the third way.

37. On or about the following dates, Company 50 made direct deposits for wages of coconspirator overseas remote IT workers into CHAPMAN's USFI-2 account, which were falsely attributed to a U.S. person:

| Sub-¶ | Company 50 Deposit Date | Identity Used | Deposit Amount |
|---|---|---|---|
| a. | 4/20/2022 | "Weichong C." | $1,751.60 |
| b. | 05/19/2022 | "Weichong C." | $8,662.14 |
| c. | 06/02/2022 | "Weichong C." | $4,331.12 |
| d. | 06/16/2022 | "Weichong C." | $4,331.14 |
| e. | 06/30/2022 | "Weichong C." | $4,331.12 |
| f. | 07/14/2022 | "Weichong C." | $4,331.14 |
| | | Total | $27,738.26 |

(**Conspiracy to Commit Bank Fraud**, in violation of Title 18, United States Code, Sections 1344(1) & (2), 1349)

**COUNT FOUR**
(Aggravated Identity Theft)

38. The allegations in Paragraphs 1 through 37 of this Indictment are incorporated and re-alleged by reference herein.

39. Between in or around October 2020, and on or about October 26, 2023, CHAPMAN and others known and unknown to the Grand Jury, within the District of Columbia and elsewhere, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), *to wit* conspiracy to commit wire fraud and conspiracy to commit bank fraud as set forth in Counts Two and Three, knowing that the means of identification belonged to another actual person, including the use of identities defined in ¶¶ 23(r), 32-34, 37.

(**Aggravated Identity Theft**, in violation of Title 18, United States Code, Sections 2, 1028A(a)(1))

**COUNT FIVE**
(Conspiracy to Commit Identity Fraud)

40. The allegations in Paragraphs 1 through 37 of this Indictment are incorporated and re-alleged by reference herein.

41. Between in or around October 2020, and on or about October 26, 2023, CHAPMAN and others known and unknown to the Grand Jury, within the District of Columbia and elsewhere, knowingly combined, conspired, and agreed together and with each other to transfer, possess, and use, in or affecting interstate or foreign commerce, without lawful authority, a means of identification of another person, namely, the names, Social Security numbers, and dates of birth of the stolen or borrowed U.S. person identities, with the intent to commit, and to aid and abet, in connection with, unlawful activity that constitutes a violation of Federal law and that constitutes a felony under applicable State and local law, namely, conspiracy to commit wire fraud

and bank fraud, as described in Counts Two and Three, and as a result of the offense, CHAPMAN and the conspirators obtained something of value aggregating $1,000 or more during any 1-year period.

(**Conspiracy to Commit Fraud and Related Activity in Connection with Identification Documents**, in violation of Title 18, United States Code, Sections 1028(a)(7), (b)(1)(D), (c)(3)(A), & (f))

**COUNT SIX**

(Conspiracy to Launder of Monetary Instruments)

42. The allegations in Paragraphs 1 through 37 of this Indictment are incorporated and re-alleged by reference herein.

43. Between in or around October 2020, until on or about October 26, 2023, defendants CHAPMAN, HAN, XU, and JIN, and others known and unknown to the Grand Jury, within the District of Columbia and elsewhere, knowingly combined, conspired, and agreed together and with each other to conduct financial transactions affecting interstate and foreign commerce, *to wit,* transfers from accounts at USFI-1, USFI-2, MST-2, and MST-3, to accounts at MST-2, MST-3, and MST-1, which involved the proceeds of a specified unlawful activity, that is conspiracy to commit wire fraud, conspiracy to commit bank fraud, and conspiracy to commit identity fraud, as described in Counts Two, Three, and Five, knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

- ***Incoming Funds from U.S. Companies Transferred to MST Accounts***

44. On or about the following dates, CHAPMAN received payroll wages for coconspirator overseas IT workers from U.S. companies directly deposited into her USFI-2

account, and then transferred those funds into XU's account at MST-3, headquartered in New York, including as follows:

| Sub-¶ | Payroll Deposit Date | Payroll Deposit Amount | Transfer Date to MST-3 | Transfer Amount |
|---|---|---|---|---|
| a. | 4/20/2022 | $1,751.60 | 4/28/2022 | $1,750.84 |
| b. | 5/19/2022 | $8,662.14 | 5/23/2022 | $8,662.14 |
| c. | 6/2/2022 | $4,331.12 | 6/4/2022 | $4,331.12 |
| d. | 6/16/2022 | $4,331.14 | 6/18/2022 | $4,331.14 |
| e. | 6/30/2022 | $4,331.12 | 7/5/2022 | $4,331.00 |
| f. | 7/14/2022 | $4,331.14 | 7/15/2022 | $4,330.00 |
| | | | Total | $23,406.24 |

45. In addition, coconspirator overseas IT workers from U.S. companies directly deposited funds into CHAPMAN's USFI-1 account, and then transferred those funds into HAN's account at MST-1, operating in New York.

| Sub-¶ | Payroll Deposit Date | Payroll Deposit Amount | Transfer Date to MST-1 | Transfer Amount |
|---|---|---|---|---|
| a. | 9/15/2022 | $ 3,328.58 | 9/28/2022 | $544.00 |
| b. | 9/15/2022 | $ 4,886.26 | 10/3/2022 | $4856.26 |
| c. | 9/30/2022 | $ 4,886.27 | 10/14/2022 | $4856.27 |
| | | | Total | $10,256.53 |

46. Between on or about January 15, 2021, and on or about October 26, 2023, approximately $990,248.84 was deposited into HAN's account at MST-1 from various U.S. companies, including those whose laptops were operated at CHAPMAN's laptop farm at her residences, and the money thereafter transferred out to other MST-1 accounts.

- ***Money Paid by Overseas IT Workers for CHAPMAN's Services Via MSTs***

47. On or about February 28, 2022, CHAPMAN messaged with Zhonghua, wherein he directed CHAPMAN to send an invoice to him. CHAPMAN did send a "February 2022 Invoice" which showed fees related to 15 different identities working for 17 different listed U.S. companies.

Zhonghua then wrote, "and from next month, we will pay the money via [MST-3]. How do you think about this?" CHAPMAN responded, "That sounds good. The feds here are now tracking every penny on [MST-2], [MST-4], etc. They aren't doing that on [MST-3] yet."

48. On or about the following dates, CHAPMAN charged coconspirator overseas IT workers for "rent" and other fees for the services that she rendered in operating the laptop farm, to include logging into the U.S. companies' laptops, connecting to the U.S. companies' networks, connecting the overseas IT workers remotely to the laptops, providing technical support with the connections, storage of the laptops, and shipping laptops:

| Sub-¶ | Approximate Date | Amount |
|---|---|---|
| a. | 11/30/2021 | $2,832.00 |
| b. | 12/31/2021 | $3,586.00 |
| c. | 1/31/2022 | $3,601.00 |
| d. | 2/28/2022 | $4,325.00 |
| e. | 3/31/2022 | $6,556.00 |
| f. | 4/30/2022 | $8,179.00 |
| g. | 5/31/2022 | $11,731.00 |
| h. | 6/30/2022 | $10,688.00 |
| i. | 7/31/2022 | $12,464.00 |
| j. | 8/31/2022 | $9,515.00 |
| k. | 9/30/2022 | $10,001.00 |
| l. | 10/31/2022 | $5,170.00 |
| m. | 11/30/2022 | $9,369.00 |
| n. | 12/31/2022 | $8,561.00 |
| o. | 1/31/2023 | $7,453.00 |
| p. | 2/28/2023 | $8,778.00 |
| q. | 3/31/2023 | $4,459.00 |
| r. | 4/30/2023 | $7,920.00 |
| s. | 5/31/2023 | $4,698.00 |
| t. | 6/30/2023 | $7,642.50 |
| u. | 7/31/2023 | $7,847.50 |
| v. | 8/31/2023 | $2,175.50 |
| w. | 9/30/2023 | $9,179.50 |
| x. | 10/31/2023 | $10,119.00 |
| | Total | $176,850.00 |

49. Between in or around March 2021, and in or around March 2023, XU's MST-2 account sent CHAPMAN's MST-2 Account A 90 transfers totaling approximately $142,919.00. Most of the transfers contained notes that referenced "Service Fee," "Shipment Fee," "Development Work," "Web Design," "Purchase Computer," Equipment Purchase," and "HTML Design."

50. Between on or about December 14, 2021, and on or about April 3, 2023, JIN's MST-2 account sent CHAPMAN's MST-2 Account A nine transfers totaling approximately $12,210.00. Most of the transfers contained notes that referenced "Service Fee" or "Shipment Fee."

51. Between in or around September 2021, and in or around June 2023, CHAPMAN transferred $153,857 from her MST-2 Account to her USFI-2 account.

(**Conspiracy to Launder of Monetary Instruments**, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) & (h))

**COUNT SEVEN**

(Prohibition of Unlicensed Money Transmitting Business)

52. The allegations in Paragraphs 1 through 51 of this Indictment are incorporated and re-alleged by reference herein.

53. Between in or around October 2020, until on or about October 26, 2023, within the District of Columbia and elsewhere, CHAPMAN and others known and unknown to the grand jury did knowingly conduct, control, manage, supervise, direct and own all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce, while failing to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330, or regulations prescribed under that section, and aided and abetted the same.

(**Prohibition of Unlicensed Money Transmitting Business**, in violation of Title 18, United States Code, Sections 1960(a), 2)

**COUNT EIGHT**
(Conspiracy to Cause the Unlawful Employment of Aliens)

54. The allegations in Paragraphs 1 through 51 of this Indictment are incorporated and re-alleged by reference herein.

55. Between in or around October 2020, until on or about October 26, 2023, CHAPMAN and other coconspirators known and unknown to the Grand Jury, within the District of Columbia and elsewhere, knowingly combined, conspired, and agreed together and with each other to commit a crime against the United States, namely, violations of 8 U.S.C. § 1324a, *to wit* the hiring, recruiting, and referring for a fee aliens, that is coconspirator overseas IT workers for employment in the United States, knowing that said aliens were not authorized for employment in the United States, with respect to such employment.

(**Conspiracy to Cause Unlawful Employment of Aliens**, in violation of Title 18, United States Code, Section 371 and Title 8, United States Code, Section 1324a(a)(1)(A) and 1324a1324A(f)(1))

**FORFEITURE ALLEGATION**

56. The allegations contained in Counts One through Eight of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

57. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of violations of Title 18, United States Code, Sections 1028, 1343, 1344, defendant CHAPMAN shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds

traceable to this offense. The property to be forfeited includes, but is not limited to, the following:

a. Funds in CHAPMAN's accounts, as follows:

| Sub-¶ | Financial Institution | Amount | Identifier |
|---|---|---|---|
| 1 | USFI-2 | $9,767.08 | Act. No. *6710 |
| 2 | USFI-1 | $2,117.47 | Act. No. *0368 |

b. Wages and monies accrued by overseas IT workers, as follows:

| Sub-¶ | Seized From | Identity Used | Identifier | Amount |
|---|---|---|---|---|
| 1 | Company 32 | "James B." | Technical Consultant - PO-0005486 | $6,400.00 |
| 2 | Company 50 | "WeiChong C." | SSN *8146 | $9,007.73 |
| 3 | Company 29 | "Jade H." | SSN *6658 | $1,292.12 |
| 4 | Company 36 | "Lee Y." | SSN *2245 | $3,553.34 |
| 5 | Company 10 | "Asolelei T." | SSN *8216 | $6,889.60 |
| 6 | Staffing Company 11 | "Charles C." | SSN *2658 | $5,115.38 |
| 7 | Company 1 | "Daniel B." | SSN *9074 | $23,569.37 |
| 8 | Company 10 | "Asolelei T." | SSN *8216 | $4,904.55 |
| 9 | Company 46 | "Ryan F." | SSN *7992 | $5,970.61 |
| 10 | Company 53 | "Matthew R." | SSN *7198 | $7,198.52 |
| 11 | MST-1 | JIHO HAN | Membership No. *7044 | $6,072.47 |
| 12 | Company 28 | "Irving B." | SSN *3338 | $2,124.71 |
| 13 | Company 14 | "Cody W." | SSN *2295 | $1,825.99 |
| 14 | Payroll Company 1/ Company 48 | "Scott L." | SSN *5106 | $9,473.63 |
| 15 | Staffing Company 11 | "Charles C." | SSN *2658 | $7,235.70 |
| 16 | Staffing Company 23 | "Frank A." | SSN *0908 | $16,155.15 |
| 17 | Staffing Company 24 | "James B." | SSN *9838 | $3,541.20 |
| 18 | Staffing Company 25 | "Dong C." | SSN *3852 | $8,907.16 |
| 19 | Staffing Company 26 | "Dong C." | SSN *3852 | $6,956.00 |

c. All fees, payments, and monies derived from services performed on behalf of the conspiracy.

58. The allegations contained in Counts One through Eight of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to

Title 18, United States Code, Sections 982(a)(1).

59. Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Sections 1956 & 1960, defendants CHAPMAN, XU, HAN, and JIN shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property. The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to this offense. The property to be forfeited includes, but is not limited to, the following:

a. Funds in CHAPMAN's accounts, as follows:

| Sub-¶ | Financial Institution | Amount | Identifier |
|---|---|---|---|
| 1 | USFI-2 | $9,767.08 | Act. No. *6710 |
| 2 | USFI-1 | $2,117.47 | Act. No. *0368 |

b. Wages and monies accrued by overseas IT workers, as follows:

| Sub-¶ | Seized From | Identity Used | Identifier | Amount |
|---|---|---|---|---|
| 1 | Company 32 | "James B." | Technical Consultant - PO-0005486 | $6,400.00 |
| 2 | Company 50 | "WeiChong C." | SSN *8146 | $9,007.73 |
| 3 | Company 29 | "Jade H." | SSN *6658 | $1,292.12 |
| 4 | Company 36 | "Lee Y." | SSN *2245 | $3,553.34 |
| 5 | Company 10 | "Asolelei T." | SSN *8216 | $6,889.60 |
| 6 | Staffing Company 11 | "Charles C." | SSN *2658 | $5,115.38 |
| 7 | Company 1 | "Daniel B." | SSN *9074 | $23,569.37 |
| 8 | Company 10 | "Asolelei T." | SSN *8216 | $4,904.55 |
| 9 | Company 46 | "Ryan F." | SSN *7992 | $5,970.61 |
| 10 | Company 53 | "Matthew R." | SSN *7198 | $7,198.52 |
| 11 | MST-1 | JIHO HAN | Membership No. *7044 | $6,072.47 |
| 12 | Company 28 | "Irving B." | SSN *3338 | $2,124.71 |
| 13 | Company 14 | "Cody W." | SSN *2295 | $1,825.99 |
| 14 | Payroll Company 1/ Company 48 | "Scott L." | SSN *5106 | $9,473.63 |

| | | | | |
|---|---|---|---|---|
| 15 | Staffing Company 11 | "Charles C." | SSN *2658 | $7,235.70 |
| 16 | Staffing Company 23 | "Frank A." | SSN *0908 | $16,155.15 |
| 17 | Staffing Company 24 | "James B." | SSN *9838 | $3,541.20 |
| 18 | Staffing Company 25 | "Dong C." | SSN *3852 | $8,907.16 |
| 19 | Staffing Company 26 | "Dong C." | SSN *3852 | $6,956.00 |

c. All fees, payments, and monies involved in services performed on behalf of the conspiracy.

60. If any of the property described above, as a result of any act or omission of a defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

Matthew M. Graves / SMM

Attorney of the United States in
and for the District of Columbia